792 So.2d 1207 (2001)
Ronald Keith WILLIAMS, Appellant,
v.
STATE of Florida, Appellee.
No. SC89668.
Supreme Court of Florida.
July 12, 2001.
Rehearing Denied August 24, 2001.
Carey Haughwout, Public Defender, and Jeffrey L. Anderson, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Sara D. Baggett and Leslie T. Campbell, Assistant Attorneys General, West Palm Beach, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Ronald Keith Williams. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
The facts surrounding the murder with which Williams was charged are immaterial to our resolution of the dispositive issue in this capital case: whether Williams was denied a fair trial when the trial court permitted substitution of a juror who became unable to proceed after guiltphase deliberations had begun. For the following reasons, we reverse William's conviction for first-degree murder and vacate his sentence of death, holding that, whenever a juror becomes unable to continue jury service after guilt phase deliberations have commenced but before a guilt phase verdict is returned, a new guilt phase trial is required.

Removal And Replacement of Juror Number Ten
At the close of all the evidence, after the jury had retired to deliberate and deliberations *1208 had proceeded for over four hours, the trial court received a note from the jury. This note read: "Juror number ten requests that she be allowed to speak to Judge Shapiro. She feels that she's emotionally unable to make a decision, either way." When the juror explained her note, the following occurred:
THE COURT: I don't know what that means. In other words, we have sat here for approximately a month, and both sidesthe State has presented evidence, the defense has cross examined State's witnesses, I have instructed you on the law. Can you apply the law to the evidence and attempt to determine has the State proven the elements, or do you feel you're unable to do that?
[JUROR NUMBER TEN]: I can't do that. I can't bring myself to that.
THE COURT: Why not?
[JUROR NUMBER TEN]: I've been through that before and I couldn't handle it before.
THE COURT: What?
[JUROR NUMBER TEN]: Before my sonwith my son. I was with it before with my son.
THE COURT: How come you didn't tell us about that when we were questioning you?
[JUROR NUMBER TEN]: I tell my son, he was actually before three times.
. . . .
[JUROR NUMBER TEN]: Okay. I've been to court with my son three years ago, I'm saying, now, for a crime he didn't commit. I'm saying now, and I can't, I just can't do it. I can't bring myself to do this. I can't do this. You understand what I'm saying?
THE COURT: No, I don't understand a word you're saying. In other words, we went into a great deal of questioning. We spent approximately two weeks questioning jurors and I want to know if you had any feelings or emotions that you didn't bring up?
[JUROR NUMBER TEN]: I had, at that time, no, I did not.
THE COURT: All right, can you listen to the other jurors discussing their views of the evidence and applying the law to it and would that help you?
[JUROR NUMBER TEN]: I cry. I couldn't. We try, but I couldn't go through that. I can't do it. So, I just cannot do it.
Thereafter, both parties declined the court's offer to question juror number ten.
Williams moved for a mistrial. This motion was denied and, over Williams' objection, the court excused juror number ten and substituted an alternate. Upon the alternate's arrival, the reconstituted jury was instructed, and then deliberated for less than three hours. After deliberating, the jury returned a unanimous verdict of guilty.

ANALYSIS
The dispositive issue here is whether the trial court reversibly erred in substituting an alternate juror into the jury panel to replace an original juror who was unable to proceed after the deliberative process had already begun. Because we conclude that it did, we must remand this case for a new trial.
The parties have provided an analysis of the wide spectrum of positions which courts in other jurisdictions have taken regarding this issue. Some have established a "bright line," "closed door" rule which (metaphorically speaking) proscribes such substitutions in all cases once the jury room door is closed, and deliberations have begun. Under that analysis, it is "per se" reversible error to allow an alternate to replace an incapacitated juror (regardless *1209 of the cause) once jury deliberations have begun. Cf. People v. Ryan, 19 N.Y.2d 100, 278 N.Y.S.2d 199, 224 N.E.2d 710 (1966) (holding that, even though the applicable statute permitted juror substitution after deliberations began, automatic reversal would be required because prejudice was too difficult to evaluate).
Other jurisdictions have applied a harmless error analysis. Yet, even those authorities do not concur regarding whether a rebuttable presumption of prejudice will apply, or whether the burden will be placed initially on the defendant to show evidence of prejudice, and then shift to the State to rebut such showing. Compare Plate v. State, 925 P.2d 1057, 1061 (Alaska Ct.App.1996) (observing that "[w]e must presume that the deliberations of an unchanging group of twelve are not equivalent to the deliberations of a group of eleven who are later joined, in the middle of their deliberations, by a twelfth person"); People v. Burnette, 775 P.2d 583, 590 (Colo.1989) (finding that "the mid-deliberation replacement of a regular juror with an alternate must be presumed to have prejudiced the defendant," and such presumption "can be overcome only by a showing that the trial court took extraordinary precautions to ensure that the defendant would not be prejudiced and that under the circumstances of the case, the precautions were adequate to achieve that result"); and State v. Sanchez, 129 N.M. 284, 6 P.3d 486, 495 (2000) (holding that juror substitution after a criminal case has been submitted to the jury is error under the applicable rule of procedure, and creates a presumption of prejudice which may only be overcome where the State shows that, under the circumstances, "the trial court took adequate steps to ensure the integrity of the jury process"); with People v. Fudge, 7 Cal.4th 1075, 31 Cal. Rptr.2d 321, 875 P.2d 36 (1994) (finding no error in substituting an alternate for a discharged juror where the issue was deemed waived by the defendant's failure to object to the juror substitution, even though the jury had already reached guilty verdicts on three of five counts); and Perry v. State, 255 Ga. 490, 339 S.E.2d 922, 925 (1986) (finding that the trial court acted well within its discretion in substituting the alternate after the jury had retired to deliberate where "the court made every effort to contact the juror as soon as possible and ascertained that she had not been contaminated by outside information or influence").
Only two Florida cases have addressed the issue of juror substitution during deliberations. In Sotola v. State, 436 So.2d 1001 (Fla. 5th DCA 1983), the district court of appeal determined that the trial court did not commit fundamental error in seating an alternate juror after guilt-phase deliberations had begun where the alternate, although previously discharged, had not been "tainted" during her absence, and the newly-constituted jury had commenced its deliberations anew. In so holding, it observed:
In summary, it appears that Florida has no statutory or procedural authorization for substitution of an empanelled juror after discharge of the alternates and commencement of deliberations. In the event of timely objection, it should not be done. See 84 A.L.R.2d 1288. But there is no constitutional impediment to such substitution, and it is not fundamental error to permit it in the absence of timely and proper objection. In the instant case, inquiry revealed that the alternate juror, Mrs. Bellamy, had not been "tainted" during her absence and that the "new" jury recommenced its deliberation from "scratch," although not instructed to do so. The record and the juror interviews reveal that there were no ulterior or improper motives on *1210 the part of the trial judge, the prosecutor, or the other eleven jurors which resulted in the discharge of Juror Rosenberg.
Id. at 1009.
Later, in McGill v. State, 468 So.2d 356 (Fla. 3d DCA 1985), the Third District declined to decide whether substitution of a sitting juror with an alternate after deliberations had begun was per se reversible error. However, in that case, it determined that it was not harmless error to substitute an alternate who, in answer to the court's ex parte inquiry after having been discharged, had told the court that he would find the defendant guilty. Id. at 357-58.
The difficulty in employing a harmless error analysis to review juror substitutions, as did the appellate courts in Sotola and McGill, is that any well-intentioned questioning of the jurors, original or alternate, in a good-faith attempt to provide those safeguards recognized under such an analysis is itself fraught with potential to contaminate the jury process. The concept of a jury's sacred province, and a concomitant reluctance to invade that province, is deeply ingrained in our jurisprudence. See Martha I. Morgan, The Constitutional Right to Know Why, 17 Harv. C.R.-C.L. L.Rev. 297, 333 n. 146 (1982) (explaining the constitutional right to reasoned judicial decisions, but observing, at the outset, that the author would not discuss "the more problematic issue of the application of a reasons requirement to jury as opposed to judicial decisions," because the "values that would be served by requiring explanations of jury verdicts might well be outweighed by the values served by the traditional reluctance to invade the `sacred province' of the jury's deliberative process") (citing Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932); United States v. Maybury, 274 F.2d 899 (2d Cir.1960)). It is thus nearly impossible to perform a harmless error analysis without breaching, in some manner, that circumspect restraint which characterizes our jury fact-finding system.
We recognize that here, the trial judge, under challenging circumstances, endeavored to do his very best to salvage the enormous resources invested in this lengthy case. Further, the State urges that there is overwhelming evidence of Williams' guilt, suggesting that a harmless error rule should be applied. When viewed in the proper, broader, context, howevera context cognizant that our jurisprudence requires, most particularly in capital cases, that the issue of guilt or innocence be decided by a properly-constituted jurywe are constrained to determine that whenever, as here, a juror becomes unable to proceed during deliberations, a new trial of the matter which was the subject of those deliberations is required.
While the spectre of jury taint requires a new trial any time a juror becomes incapacitated during deliberation, this concern is particularly underscored where, as here, the removed juror's incapacitation arises directly from participation in the deliberative process. While the trial court determined in this case that juror number ten's emotional incapacitation was purely personal, the exchange between the court and the juror clearly reflects that it was the juror's previous negative experiences with the criminal justice system, along with the pressures or circumstances of the deliberative process itself, which rendered her presently unable to participate as a juror; thus, juror number ten's problem, rather than being purely "personal," was inextricably tied to her activities as a juror.
Further, had juror number ten, during initial voir dire, disclosed the eventual *1211 cause of her incapacitation (her past, negative experiences with the criminal justice system), this arguably would have subjected her to challenge for cause. Cf. Jennings v. State, 512 So.2d 169, 173 (Fla. 1987) (observing that a juror's concealment on voir dire of information which may have been material to whether the juror would have been excused on peremptory challenge or for cause, and which is not revealed or discovered until after trial, can justify the granting of a new trial). We note in passing that, although this juror failed to disclose her son's involvement in the criminal process during voir dire, she did reveal that she had not given any prior thought to the death penalty, perhaps presaging some future difficulties and warranting further inquiry. The State moved to strike her as a prospective juror on that basis, indicating "her potential inability to not be able to impose the death penalty pursuant to laws." Defense counsel objected on the ground that "it's a racially motivated strike," citing State v. Neil, 457 So.2d 481 (Fla.1984). The trial court, not finding the stated basis to be race-neutral, denied the strike.
Based upon the foregoing, we reverse William's conviction for first-degree murder and vacate his sentence of death. This case is remanded to the trial court with directions that a new trial be conducted. Because we are remanding for a new trial, we need not address any remaining issues which Williams has presented on appeal.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, PARIENTE, LEWIS, and QUINCE, JJ., concur.
ANSTEAD, J., concurs specially with an opinion.
ANSTEAD, J., specially concurring.
One can only have sympathy for a trial court placed in the position the trial court was here, when, after more than four hours of deliberations by the jury, one juror announced that she was emotionally distraught because of the stress of the deliberations and could not continue. However, under our constitutional system guaranteeing a trial by jury, once the jury process broke down, as it did here, it could not be put back together again by simply discharging the troubled juror and substituting a previously discharged alternate. Once there is such a fundamental breakdown in the process and the integrity of the twelve-person jury is disturbed, we have no choice but to begin anew. We should find solace in our commitment to such a system and the fact that breakdowns such as this are the rare exception, not the rule.
It is important to note that in Florida, once deliberations begin, capital juries are sequestered, i.e., they are kept together and their integrity maintained throughout the deliberative process. See generally Livingston v. State, 458 So.2d 235 (Fla. 1984). Further, our rules provide for the discharge of alternate jurors once the jury actually begins its deliberations. See Fla. R.Crim. P. 3.280. Here, the alternate was released and not sequestered with the rest of the jury. Under such circumstances there is simply no way of guaranteeing the integrity of a newly constituted jury now composed of eleven jurors who have already deliberated together as a group of twelve for a substantial period of time, and another thirteenth juror who has been discharged back into the community.
Many jurisdictions have come to grips with this issue and have come to the same conclusion the majority reaches today. The North Carolina Supreme Court, for example, has explained:

*1212 In this case, the jury verdict was reached by more than twelve persons. The juror who was excused participated in the deliberations for half a day. We cannot say what influence she had on the other jurors, but we have to assume she made some contribution to the verdict. The alternate juror did not have the benefit of the discussion by the other jurors which occurred before he was put on the jury. We cannot say he fully participated in reaching a verdict. In this case, eleven jurors fully participated in reaching the verdict, and two jurors participated partially in reaching a verdict. This is not the twelve jurors required to reach a valid verdict in a criminal case.
State v. Bunning, 346 N.C. 253, 485 S.E.2d 290, 292 (1997). Similarly, the Colorado Supreme Court has declared:
The alternate juror entered the jury room after the eleven regular jurors had sifted the evidence for four and one-half hours, and may well have made progress toward formulating positions. The reconstituted jury then deliberated for only one-half hour before being dismissed for the day and returning to deliberate for a portion of the following day until they reached agreement. Although the trial judge instructed the regular jurors to begin deliberations anew, he did not inquire of them whether they would be capable of disregarding their previous deliberations and any opinions they may have formed on the questions presented by the evidence. Nor did the trial judge ask them whether they could be receptive to the alternate jurors's attempt to assert a nonconforming view. Moreover, the alternate juror, who had been released from his duties for approximately twenty-four hours before being recalled, had resumed his normal functions in the community. Although he had been instructed by the trial judge not to discuss with others his "view of the case" or what his verdict would be, he was not told to refrain from forming an opinion based on information that might come to his attention after discharge. When he returned to the courthouse to participate in deliberations, he was not questioned about his activities or his present ability to serve on the jury. In sum, the trial judge received no assurances from either the remaining regular jurors or the alternate juror that the ability of the reconstituted jury to render a fair verdict would be unimpaired by the substitution.
People v. Burnette, 775 P.2d 583, 590-91 (Colo.1989).
A trial by jury contemplates that once the deliberative process has begun with a set group of jurors, the decision, or the indecision, rests with that set group. If the jury is unable to reach a unanimous decision, even if it is because of the inability of a single juror to decide the case, then a mistrial must be declared. That is a contemplated and essential part of the jury system. It is part of the requirement of unanimity.
It is also important to note that this was not a case in which a juror became ill, suffered an accident or illness in her family, or was disqualified by some other unanticipated event. Here it is apparent that it was the stress of the responsibility of having to decide this case that resulted in the juror's eventual breakdown and inability to reach a decision. That this may happen is simply a risk we assume because we value the system of trial by jury. When one juror cannot decide, the jury cannot decide.